# LAAS v. SCOTT.

PATENTS; INTERFERENCE; BURDEN OF PROOF; DOCUMENTARY EVIDENCE;
   WITNESSES; REFRESHING MEMORY OF; PROOF OF CONCEPTION; REDUC-
   TION TO PRACTICE; DILIGENCE.

1. The burden of proof imposed upon a junior applicant in interference
   proceedings is not increased by the granting of a patent to his oppo-
   nents while his application is pending.

2. Where a witness testifies positively to a date, and states that he is able
   to fix such date by the daily work record of a corporation, it is not
   necessary to offer the work record in evidence, for such document would
   not be admissible at all, but could only serve to refresh the memory
   of the witness.

3. There is no reasonable difference between a statement by a witness fixing
   a date by reference to an original paper in the possession of a person

within the jurisdiction, or to a regular business entry in such person's books, and a statement fixing a date by something calculated to fix it in mind, claimed to have happened to the witness, or in the community, about the same time.

4. A failure immediately to manufacture and put on the market a newly invented device does not afford any reasonable foundation for denying the date claimed for its conception, where the inventor is already engaged in disposing of a large stock of devices manufactured under former patents relating to the same subject-matter, of which the new invention is an improvement.

5. The rule requiring diligence in reduction to practice is not satisfied by mere diligence in attempting to secure capital to manufacture and exploit the device invented. If the expense of an experimental device is so great as to prevent an actual reduction to practice, it is the duty of the inventor to secure his right by a constructive reduction to practice by filing an application for a patent. (Following *Seeberger* v. *Dodge*, 24 App. D. C. 476.)

6. An inventor, who, although the first to conceive, is the last to reduce to practice; and who is not exercising diligence when his opponents enter the field,—is not entitled to priority.

No. 325. Patent Appeals. Submitted November 24, 1905. Decided December 5, 1905.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Joseph B. Connolly, Mr. Otto R. Barnett,* and *Mr. James H. Raymond* for the appellants.

*Messrs. Winkler, Flanders, Smith, Bottum, & Vilas,* and *Mr. William G. Henderson* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Edward Laas and Hiram H. Sponenburg appeal from the decision of the Commissioner of Patents in an interference pro-

ceeding, awarding priority to John M. Scott of the invention defined in the following issue:

"1. A railway-rail stay consisting of two separate rail-gripping jaws fulcrumed on the rail flanges and with horizontally prolonged bottom bearings sustained out of contact with each other and abutting the side of the tie, lugs projecting from said bottom bearings, and a bolt engaging the lugs and provided with means for drawing the jaws into engagement with the rail as set forth.

"2. A railway-rail stay consisting of separate laterally movable rail-gripping jaws, each formed with a bottom portion bearing on the under side of the rail and with a depending lug, a bolt passing through the lugs and provided with a head on one end and with a nut on the opposite end, and an abutment depending from the bottom bearing of one of the jaws as set forth and shown."

The appellants were first to enter the Patent Office, having filed their joint application December 16, 1903, which was followed by a patent granted thereon April 19, 1904. Appellee's application was filed March 10, 1904. The ordinary burden of proof imposed upon the latter as junior applicant is not increased by. the patent granted his opponents while his application was pending.

Scott, in his preliminary statement, alleged conception May 5, 1902; making of patterns before May 12, 1902; manufacture and putting upon sale late in 1903.

Laas and Sponenburg alleged joint conception of the invention June 27, 1903, making of model and castings on June 29, 1903.

The Examiner of Interferences decided in favor of Scott. His conclusions were, that Scott conceived in May, 1902, but did not reduce to practice; that there was no certain date of conception proved by the appellants prior to their filing date; and that Scott was using diligence when they entered the field. The decision of the Examiners-in-Chief is in substantial agreement. The Commissioner briefly states his acceptance of the conclusions of the other tribunals, and directs his attention to the consideration of the questions, whether Scott was entitled to make the

claims of the issue, or there was an interference in fact. Those are not before us.

Before entering upon the consideration of the points involved, it will not be irrelevant to give a brief history of the art and of the several inventors' connection therewith. It has been long known that the rails of a railway track have a tendency to "creep,"—that is, to move longitudinally in the direction which the trains of cars take. With the great increase of weight in engines and freight cars, and the doubling of tracks through which the pressure on each track is almost entirely in one direction, the results of "creeping" have increased to such an extent as to require frequent repairing of tracks at crossings and side tracks with switches. The difficulty is particularly great at crossings of other railways.

Laas is a railway superintendent, and has been connected with steam-railway operation for about twenty-three years, as civil engineer, roadmaster, and superintendent of construction, successively. Sponenburg is a track foreman, and has been engaged in railway construction for twenty-five years. In 1898, the latter had his attention specially directed to the creeping of the rails, and in October, 1900, he filed an application for a patent for his first device to meet the condition. In the latter year he showed the device to Laas and they associated themselves together for the purpose of making improvements in the same line. Jointly, they were granted patents on July 1, 1902, February 10, 1903, May 3, 1904, May 17, 1904, as well as the one in issue, April 19, 1904.

It is enough to say of the earlier patents that they show a clamping device differing, to speak in general terms, from the subject-matter of the interference, in that the connecting bolt between the jaws of the former was formed integrally with one of the jaws, while in the latter it is separable from both jaws, but extending through each.

Scott was a mechanic and pattern maker with an inventive talent, who had invented several different devices. Among these was a band fastener, which, having been for a time exploited and sold by him in connection with a business associate named

Walker, had been disposed of entirely. Other inventions consisted of "snap flasks," ball bearings for mowers and reapers, "car movers," and bumping posts for railway tracks.

Without discussing the evidence, we are content to accept the conclusions of the Patent Office tribunals to the effect that Scott conceived the invention of the issue in May, 1902, but that his experiments therewith did not amount to actual reduction to practice. We are not satisfied, however, with the conclusion of the Examiner of Interferences that the appellants failed to show an earlier conception than is evidenced by their application for patent, which conclusion the succeeding tribunals adopted without discussing the grounds upon which it was rested. We are compelled to regard those grounds as insufficient. Laas and Sponenburg testified positively that they conceived the invention and had castings made from their model in the Belle City Malleable Iron Company's works, at Racine, Wisconsin, on June 29, 1903. In this statement they were supported by the son of Sponenburg and by Bryan, the assistant manager of said company, Fisher, the foreman in the pattern room, and Blatz, the shipping clerk. These witnesses were neither impeached nor contradicted, and their testimony disclosed no inconsistencies. Bryan has some interest because his company is now manufacturing under appellants' patent through a license; but the two mechanics have no apparent interest. Moreover, none of the tribunals aforesaid has intimated a doubt of their general truthfulness. The witnesses Sponenburg, Jr., Bryan, Fisher, and Blatz, gave the date of making the castings, but their evidence was not accepted as proving it because they testified from memory alone, and gave no reference to anything to fix the date. The reason for rejecting the date fixed by Laas and Sponenburg, the elder, is thus given in the decision of the Examiner of Interferences:

"Sponenburg's testimony shows that, in stating the date of conception of the invention, he depended entirely upon what he was told by the Belle City Malleable Iron Company, and Laas also bases his testimony upon what the records of that company show. These records, as before stated, are not in evidence. It

does not appear that either Laas or Sponenburg ever saw them,
or that Bryan, the secretary and treasurer of the company, re-
ferred to them before testifying. It would have been an easy
matter for Laas and Sponenburg, or their witness, Bryan, an
officer of the Belle City Malleable Iron Company, to have pro-
duced the records of that company. Instead of doing so, they
merely make vague references to these records, and do not even
testify that they consulted them for the purpose of refreshing
their memories before testifying. In *Blatch* v. *Archer,* 1 Cowp.
63, 65, referred to and quoted in *Kirby* v. *Tallmadge,* 160 U. S.
379, 40 L. ed. 463, 16 Sup. Ct. Rep. 349, Lord Mansfield laid
down the rule that all 'evidence is to be weighed according to the
proof which it was in the power of one side to have produced and
in the power of the other to have contradicted.' The failure of
Laas and Sponenburg to produce the best evidence of their date
of conception, when that evidence was easily accessible to them,
detracts greatly from the weight of such testimony as they have
produced on this point, and renders it extremely doubtful wheth-
er they are entitled to any date of conception prior to the date of
their application for a patent.

"The failure of Laas and Sponenburg to satisfactorily fix the
date of their entry into the field renders uncertain the extent of
the period during which it is incumbent upon Scott to show dili-
gence. Under the circumstances, it appears that any doubts on
the subject should be resolved in Scott's favor."

Turning to the depositions, it appears that Sponenburg testi-
fied positively to the alleged date of making the castings in his
direct examination. When asked, on cross-examination, what
enabled him to fix the date, he said: "I got this statement
from the Belle City Iron Company or Mr. Bryan, as he had the
dates the day I went up there. And I got the dates through Mr.
Bryan when this pattern was made. I very seldom kept dates
of anything of this kind, as I knew that I could get it at the
factory at any time."

Counsel for the appellee did not follow up this inquiry, and
abstained from making a similar inquiry of Laas or Bryan, or
the two mechanics. The Examiner of Interferences treated

this statement of Sponenburg as hearsay evidence upon the idea that the company's daily record of work done was the thing to be offered in evidence. This idea was a mistaken one. The record was not admissible in evidence at all. The entry could only serve to refresh the memory of the witness, and enable him to explain why he could fix a date with certainty. If the counsel representing the appellants had been abundantly careful, he would have had the book containing the entry produced, and submitted to the inspection of his opponent. As we view it, had such a book been produced, showing entries in due order and course of business, and free of suspicious circumstances, the point might have been conclusively settled. As the question was asked, it was natural for the witness to answer substantially as he did. He gave the date and referred specifically to the means of its certain establishment. If it had been shown that there was no such entry he would have been discredited. The examination was conducted in Racine, Wisconsin, where the books, if in existence, must have been at the time. From the statement of the witness, opposing counsel might reasonably have apprehended that the books, if called for, could be produced. The course that he pursued in refraining from pursuing his inquiry concerning the book entry was one that would have suggested itself to a skilful examiner entertaining the apprehension before suggested. We see no reasonable difference between a statement made by a witness, fixing a date by reference to an original paper in the possession of a person within the jurisdiction, or to a regular business entry in such person's books, and one fixing it by reference to something calculated to fix it in mind, claimed to have happened to him or in the community about the same time. A statement of the former character would be preferable, in the interests of justice, for, if untrue, it would ordinarily furnish ample opportunity to completely discredit the witness. Bryan, the assistant manager of the company, was examined at the same hearing, and testified to the date, and could have been called upon to produce the record if there was reason to apprehend that it would not have supported the reference. Considering all of the circumstances, we are forced to the con-

clusion that the evidence was sufficient to establish June 29, 1903, as the date of the appellants' conception of the invention.

Nor are we able to perceive that appellants' failure to immediately manufacture the newly invented railway-rail stay, and introduce it into the market, affords any reasonable foundation for denying the date claimed for their conception. They were manufacturing the device of the former patents and disposing of them. Their manufacturer had large quantities on hand in anticipation of orders, and there was no competition then in the market. The change of devices would not only have hindered the sale of these, but also have necessitated extra expenditure in making a vast number of new patterns for casting, as testified to by Bryan. In addition, it appears that a casting was sent to appellants' patent solicitor in the fall of 1903, and after some delay a patent was applied for on December 16, 1903. On the other hand, Scott, who had conceived the invention and made a casting by May 12, 1902, did nothing at all until late in the fall of 1903, when he commenced to manufacture for the market; and his application was delayed until March 10, 1904.

As it has been found that Scott was the first to conceive the invention, it remains to consider whether he was exercising diligence on June 29, 1903, when the appellants made their first casting. In deciding that he was diligent on or before December 16, 1903, the date of conception according to the appellants, the tribunals of the Patent Office were governed by the fact that, shortly before, he had commenced to manufacture his device and put it upon the market in quantities. The date of conception accorded by us to the appellants carries them back several months earlier than this beginning of activity on the part of Scott. During the entire time between May 12, 1902, and June 29, 1903, Scott did nothing beyond making frequent attempts, from week to week, to induce Walker to join him in the exploitation of his invention. Walker was a man of business enterprise and capital, and had been interested with Scott, who gave him his implicit confidence, in the exploitation of the patent for the band-fastener which had been sold to one Tecktonius late in 1901 or early in 1902. Scott says that he did not so much

need Walker's money as his business capacity and management. He wanted no one but Walker to join him, and made no effort to procure any other. Walker was not willing to undertake the matter until October, 1903, when he agreed to enter into a contract which was executed in writing in December. Scott, meanwhile, was working on other inventions. One of these was the bumping post, before referred to, and patent therefor was applied for before this was filed,—the date not given.

Scott was not penniless. He was in receipt of deferred payments on account of the sale of the band-fastener, and admits that he could have furnished the money to make application for a patent. Having taken out a patent or patents before, he had a general knowledge of the requirements and cost. To hold that Scott's efforts to secure Walker's co-operation, prolonged for more than a year before his rivals entered the field, [shows diligence] would be in opposition to the general principle governing the rule of diligence in the Patent Office that has been approved by this court in analogous cases. *Seeberger* v. *Dodge,* 24 App. D. C. 476, 485. The facts therein presented made out a case of waiting upon financial assistance, in some respects, stronger than in this. The subject-matter of the invention (an escalator) was a very expensive one to construct. In discussing an excuse for delay similar to that under consideration, and affirming the decision of the Commissioner of Patents, it was said: "One having the first complete conception of an invention cannot hold the field against all comers by diligent efforts, merely, to organize and procure sufficient capital to engage in the manufacture of his device or mechanism for commercial purposes. This is a different thing from diligence in actual reduction to practice. *Wyman* v. *Donnelly,* 21 App. D. C. 81, 87. As said by the Commissioner of Patents in *Kasson* v. *Hetherington,* 88 Off. Gaz. 1157, 'diligence will not wait on business arrangements.' See *Paul* v. *Hess,* 24 App. D. C. 462. Granting the contention that actual reduction to practice is preferable to that which is constructive, merely, as more to the interest of the public, and that reasonable indulgence ought to be extended to one pursuing that course in good faith, yet, when

the construction of an experimental device involves so great cost and risk that an inventor, though possessed of sufficient means, may well hesitate to undertake the same entirely at his own expense, due diligence requires that he should then attempt to secure his right and promote the public interest by filing an application for a patent. *Dodge* v. *Fowler*, 11 App. D. C. 592, 599; *Platt* v. *Shipley*, 11 App. D. C. 576, 583; *Marvel* v. *Decker*, 13 App. D. C. 562, 565; *Cross* v. *Phillips*, 14 App. D. C. 228, 240."

The manufacture of the invention in this case to a moderate extent, at least, would not have involved great expense, and Scott was able to undertake it. Failing that, he could easily have applied for a patent before June 29, 1903.

In our opinion the appellants are entitled to the award of priority. The decision in favor of Scott will, therefore, be reversed, and the proceedings herein certified to the Commissioner of Patents in accordance with law. It is so ordered.

*Reversed.*